So we'll start with NOTO, Garden State Tire Corps v. 22nd Century Group, Inc. Before we do that, I want to just note that the remaining matters, Borley v. United States 24293, United States v. Cummings 23156, and Zeng-Smith v. Nassau Health Care Corporation 23544 are all submitted. And so those will reserve decision. So why don't we proceed with NOTO v. 22nd Century Group 21347. Thank you. Thank you. Mr. Lieberman. Good morning, Your Honors. Jerry Lieberman from Poplar House LLP on behalf of Pellitz. We respectfully submit, Your Honors, that the District Court committed a reversible error by dismissing both the claims under Sections 10b of the Securities Exchange Act and Sections 10a and 10c. Starting with the claims under 10a and 10c, the case here, the allegations in the event of complaint, clearly alleged market manipulation scheme. The Supreme Court in Lorenzo and the Second Circuit in the City of Providence v. Vance makes clear that a market manipulation scheme covers a wide variety of conduct. It's not just wash sales. It's not just bid review. It's any conduct that deceives the market into thinking that the share price reflects anything other than the supply and demand for that security. Here we allege precisely that. We allege that the CEO of 22nd Century concocted a scheme whereby he paid a stock promotion firm to publish more than 24 stock promotion articles. Is the payment by an issuer or an officer of the issuer to a stock promotion firm per se illegal? Absolutely not. Per se, it is not illegal. Then why is there any problem with that unless you allege, and the District Court found you didn't, that you controlled, reviewed, supervised the people who were doing that? Well, that would be an issue on your janitor's rejects. Well, if you just pay a promoter and you know that that promoter is violating Section 17, and you purposely are paying this promoter in order to raise the share price, in order to here, in this case, to get the share price over $2 with a performance offering, whereby the yield is $2. That's an end run around the maker requirement. You can't do that, can you? Well, Lorenzo allows you to do that. Lorenzo specifically says that even in a situation where there are certain types of conduct that are not, you don't have a liability. If you know that the publisher of the pieces or the maker of the pieces is not disclosing, that that's a problem? Of course. You are paying him. You don't just know. You are paying him to violate Section 10B. You're purposely paying him. Well, you're paying him, and he violates Section 10B, but you don't have any allegations in here that he counseled them not to disclose. No. Okay. The allegation is that he was. Right, right, right. But do you have enough? You're saying, I think, I thought you were trying to say that there was enough here that somehow he could be called a maker, that his activities were such that he was complicit. That's for Section 10B. You're talking about Section 10AC. Oh, I see. You do not need to be a maker under Section 10AC. You need that he is to be done. But how can you have, isn't there an inconsistency between what you are claiming is a conspiracy here, if any, under one section when it is allowed under the other section unless you have control and so on? Well, no, because if you are paying someone to promote a stock, to make false assertions, these were fictitious identities. Clearly, this is something that the CEO was talking to his confidential informant, was advising that he was wrong. He was someone who was clearly reviewing these articles. But then what do we do? Are we saying that the cases that don't go forward because there wasn't sufficient control were simply cases of bad pleading, that they brought that up under one section when they should have under the other? That's exactly what Lorenzo says. Lorenzo says specifically where you can't – where you have a type of conduct that deceives the market and you can't, for some reason, have that conduct under 10B, that is exactly the prophylactic necessity of Sections 10A and 10C. That's why you have 10C, to provide that wide array of product. You don't want market participants and issuers pumping up the stock, making false assertions to the market under your guise. I'd like to push you in a slightly different direction because that's one of the things that I'm going to be asking the other side, and that's the question of amendment because unlike the district court, I believe the cases do say that if defendants controlled, reviewed, and in effect were the makers of these, let us assume false or puffing or whatever statements, then there may be liability. So I want to find out about the question of amendment because you didn't ask for the amendment originally. When you asked for the amendment, it was kind of in a desultory fashion. On the other hand, it wouldn't be that difficult to amend and claim what would be enough. So I want you to argue about why you should be allowed to amend when you had a chance in a way earlier and didn't really say what you'd say in the amendment. Well, it morally makes clear, this Court has made clear, particularly when you're dealing with that, if we plead with the argument and the complaint, we believe we have sufficient allegations. If the district court had any concerns and felt there was any plugs to that, certainly morally makes it clear that we should provide that opportunity. It shouldn't be a game of captioning. Wasn't it in your favor? Wasn't it even before that? Didn't you say that you wanted to amend after you'd read the first round of the motion to dismiss? Yeah, we put that in the briefing. Put it in the briefing. So you didn't wait for the district court's decision to ask for the amendment. If the court found any deficiencies in the pleadings, we thought we should be able to amend. However, like also before, so we do clearly believe there's a market completion scheme. This is exactly what 10A and C are made to protect. When you have a scenario, when you come up with a stock price, when the market is being deceived, clearly the CEO is telling you the market is being deceived. Clearly he's reviewing the 24 articles that don't say anything about being a great promotion. They use fictitious identities. Just tell me on the facts here a little more. Did the CEO – presumably the authors were looking at the press releases, right? And did the CEO – was the CEO in communication with these authors at all and talking to them about what was going on? No, not specifically. We have the evidence that the CEO was on top of every single press release issued by the company. We have the allegation that the promotional articles always followed very closely press releases. Is there an allegation, just to follow up on that, that the promotional materials that mimicked the press releases followed the press releases? In other words, is there an allegation about the timing during which they appeared? They nearly immediately followed the press releases. That's what we allege. Okay. So you've got a – so it could be. I'm just asking that the promotional materials read or review the press releases and then put those in – you know, the promoters put that in the material. It's certainly possible, Your Honor. What's the inference? The inference is that the CEO – But you don't actually say that in your complaint. You might say it, but you don't actually say it in the complaint as it is. We don't say in the complaint that the CEO provided the press release contents to the promoter. We do say the CEO concocted an entire scheme whereby the promoter would use fictitious identities, complete fraud. Could you point out where in the complaint, Mr. Lieberman, you state that the issuer was under a duty and had a duty under the Securities Act? Either the issuer or the CEO back then had a duty to disclose any compensation to the promoters? Well, the duty to disclose the compensation is – Section 17 says – So the duty to disclose that arises from Section 17 is a duty to disclose that's placed on the promoter, not the issuer. So where is the allegation that the issuer or officers of the issuer had the requisite duty to disclose the compensation? In paragraph 160 of the complaint where the issuer, 22nd century, gives 19 reasons why the stock might be volatile. Well, but that's a different question of whether if you gave 19 reasons you also have to give something about the 20th when you don't have a duty about the 20th. That's a different point from the one that the presider was asking. Where do you say that specifically? We don't say specifically that Section 17 requires the issuer to disclose the – And we could never write that in an opinion, right? Well, if the court were to hold under Janus that the issuer was a maker, and we do allege that, and we do believe that given our control of the company and their concoction of the scheme, they would be a maker of the understatement, then under Janus if you are a publisher and they are a duty – But you're requesting – I thought you were requesting to amend in order to beef up that part of your complaint. Absolutely, absolutely. We can provide more allegations to you to show the requisite control. And so – What about the SEC? What about – well, okay. Finish up on this, and I want to ask you about the SEC non-disclosure. Sure, absolutely. But so you – so sure, it's a controlled event. But even without showing that – to show that under Janus, a maker of the statement, you have a market manipulation scheme. Now we allege that we don't see any – in that instance, we don't see any deficiency in that complaint. We have someone who concocted the scheme purposely to raise the share price, and it was done by using fictitious names of authors and done by rather violating Section 17. But the – just – and I don't want to interrupt the questions about the SEC investigation, but just so that I completely understand, the theory is not one that rests on any false statement. The theory, as I understand it – but you correct me if I'm wrong at any point – is that the – it's a failure to disclose the compensation to the promoters. Because I have not seen an allegation of an actual false statement. If the – if the court holds that the issuer was a maker of the statement, the statement – the promotional articles themselves are false statements. They're fictitious names. They're written by false people, false analysts. The press release itself is false. But the question of whether those statements are essentially puffery or are false in a material sense is not altogether clear from the complaint, I don't think. Yeah, but your principal argument is that there was a failure to disclose who paid for these statements. That's important. These are the people – the market thinks these are real analysts, and these are people with fake names and fake photos who aren't really analysts. They're just paid hands. And you do allege that the officers of the issuer here knew that these were fictitious promoters? We allege that they concocted the scheme, that they were – they understood what they were doing was wrong by not disclosing they were paid promoters. No, but that's not the answer to Judge Olenek's question. Did they know? Do you allege that they knew that these were fictitious? Every reasonable inference. We don't allege – No, no. Answer the question. You keep saying every reasonable inference. But the questions are what did you allege? We didn't allege specifically that they reviewed the individual promotional article. We said if you're consistent that they did review the articles, that he reviewed every single press release, that he concocted the scheme, and they were desperate for the scheme to succeed, how can someone pay money to a promoter and they're desperate to make a $54 million offering if you don't know exactly what the fruits of the stock promotion scheme are? It's simply impossible. No, I understand that. We were talking about the false identification of the authors, and I'm trying to focus in on exactly what the allegations were with respect to your client's knowledge of that. The CEO's knowledge of that. Right. So we can use amendments specifically that they knew they were fictitious identities. That clearly is something we can use the opportunity to amend now. I see. But also, I think this is very important, is that the denial is unstoppable. Those are outright false statements. Now, did you, to the district court, propose to amend to do what you are now telling us you would do in an amendment? We said to the district court we would like an opportunity to amend for any deficiencies in the court documents. You didn't spell out what the amendment would be. We did not spell out the amendment. And this would be an amendment under Rule 15, would it be? It would be. Yeah. As I understand it, the district court felt that if the allegations of the client were, we would be shooting in the dark. That's your Lorelei argument. That's our? Lorelei argument. Yes, yes. Exactly. Can we go briefly, at least, to the SEC disclosure? Absolutely. So just tell me, I take it that there was a series of releases, SEC filings, et cetera, that indicated that there were accounting difficulties, and then later on that they had been fixed. But during that whole period, there was an SEC investigation, correct? And I think one of the officers, I forget which one, I think he's the one with the longest name, said that he could be exposed criminally based upon what was happening with regard to these financial difficulties that we're having. And that he was concerned about it, presumably represented by a lawyer before the SEC and so forth. And you're saying that even though there was nothing that came of that, as far as we know, of that investigation, and the district judge found that they had remedied the problem, that nonetheless it had to be disclosed. It went more at the time that they're making statements regarding material weaknesses and internal controls, and their remediation efforts, they're trying to convince the market that we are a viable company, and that we're going through this, and this is an issue that we can handle. At the same time, they're admitting a critical fact, that the SEC is investigating this matter. So looking at the time, 2016, when the company's talking about the material weaknesses, talking about the remediation efforts, to not say that there's investigation of those very issues is something clearly a reasonable investment. So you're saying they disclosed some risks as far as financial was concerned, but they were playing them down, and that the disclosure of the SEC investigation would have altered the calculus of those risks? Absolutely, particularly when there were three offerings in 2016, which yielded the company $24 million, and every reason to fight that SEC investigation. I must say, and I will be asking this of the other side, I am maybe less concerned with the duty to disclose the SEC investigation once the matters were corrected in itself. But what bothers me is the statement that there was no SEC investigation. I mean, that statement seems an outright falsehood. Absolutely. And if that was made, as I say, that's really a question for the other side. Even if there wasn't a duty to disclose the SEC, why wasn't there a duty not to lie about it? On April 18, 2019, 22nd Century said that the short-sell article falsely alleges that 22nd Century is supposedly under SEC investigation. That is an outright 100% lie. There's no other way to— Wait, repeat that? The short-sell article falsely alleges that 22nd Century is supposedly under SEC investigation. Falsely alleges that we are supposedly under SEC investigation. There's nothing other to say that that is the outcome. What is the misstatement there? What is the— What is the misstatement that it's— They were under SEC investigation. They denied the existence of the SEC investigation. Is there not a SEC filing by the issuer here that there was an SEC enforcement proceeding? No. And the company also says in the October 2018 and April 2017 denials, they also say that they falsely allege that the favorable articles were the result of a stock promotion scheme. They say those allegations are frivolous. Once again, straight-up denials of the stock— So, we've kept you well past your time, Mr. Lieberman. You've reserved three minutes of rebuttal here from Mr. Tucker. Thank you very much. Thank you. Good morning. Good morning. I'm John Tucker. I represent the at-large. Let me address some of the questions before that. First of all, with regards to these paid promotional articles, there is absolutely nothing under the law that makes it in any way improper, illegal, or any way wrong for a company to pay for stock promotions. The only issue in this case that they have alleged is that if—and the case is clear under Section 17, which says that's the author's responsibility. And by saying it's the author's responsibility, it also says it's proper to have these promotions. Well, there's also a rule, but it's not cited by the plaintiffs here, Rule 205, that can make it the issuer's responsibility to disclose compensation. But that's not here. It's not here. And also, that brings us to another question that was asked. There's absolutely no allegation that there's been any communication, contact, any involvement between the CEO— But now they say we could amend to say what is enough under those cases if the company actually reviewed, controlled, in effect, were the authors of the people who set these things up. And then you would have to disclose. Now, they're saying that they would like to amend to do that. Do they have a right to do that? I think they've passed that time, Your Honor, because in their one sentence at the end of their—in response to the lower court, in the argument in front of the lower court, they didn't say this is what we can do today. No, they said if you rule against us, we would like the opportunity to amend. And then they appealed. They didn't— And in their opening brief here. And even in their final reply brief, they've never said this is the fact. And they've never said here today. But how can we say that it is futile to amend when at least today they're saying this is what we would say and what we would say would be sufficient to be a—to meet the complaint? And again, we go back to Lorelei and, you know, I must tell you that Judge LaValle, who was on that panel, was the one who pressed me—I wrote Lorelei—very strongly to say that where only at the end does it turn out what it was that they should say. It's not too late to ask for an amendment there. I was much more doubtful, but I was pushed by a senior judge. I understand the pushing. I sit here today. Here's where I think it should have happened. This is his requirement and his obligation, and that is to come to this court and not say, well, give me a chance to amend. I can amend. I can probably say these things. He needs to come here under the cleaning standards of the PSLRA and Rule 9 and say this is exactly what I would plead. And he has not. And he still does not. And he's been challenged on that in the vote, in this appeal, and as he stands up here on this court. And let me tell you what he asked for, what he asked for, which are the facts. And that's because he slings a lot of stuff in his complaint and in his brief that Mr. Siciano approved, edited, and reviewed these statements. Well, that's not true. That's a conclusion that he's making, not based upon fact. If you look at paragraph 68, and I'll read it to you. He made a complaint. He said CW1, which is the confidential informant, said, quote, he was sure that Siciano's efforts behind the scenes included reviewing, editing, and reviewing. Well, but okay. But it would not be futile to actually make an amendment that claims that Siciano had that authority. If that was manifestly false and there was nothing for it, then presumably they could be sanctioned. If instead they can make that amendment as a, and show something to support it, then how can we say it's futile? Your Honor, I think before he's given the opportunity, he needs to stand up and say, this is what I'm going to say. Okay. Now, let me turn to the last question that Judge Walker was asking, which is about the SEC investigation. It may well be that the district court is correct in saying that where an investigation is still kind of winding down, basically not really doing much, but that matters have been corrected. There is no duty to disclose it. But isn't there a duty not to lie about it when you're asked directly? And weren't you asked directly, is there an NCC investigation, and say no? Your Honor, what you did is a kind of muddying of the timeline here. The accounting weaknesses, and this was just a segregation of duties. It's a small company. It needed more people. Somebody had checked the bank statement against the record, right? They said fully disclosed, fully remediated, and also no illegal wrongdoing, not no financial misstatements. And so that happened, and it was fully remediated in 2016. As counsel said, when these articles come out in 2018, 2019, in April of 2019, more than, what would that be, three years later, the CEO of the company issued a press release that says we are not under any investigation at this time. But you were. Yes, I was. The SEC hadn't closed its investigation. This is two and a half, three years later, Judge. Well, I understand that it had begun two and three years later and there wasn't, but the statement we are not under, now, are you arguing that in fact that isn't material? It's certainly not material. Because it was something that was so trivial that much later. But as a statement, it is a misstatement because the investigation wasn't closed yet. Well, Your Honor, there's been no suggestion. You know, this all stems from an internet article that says they made a FOIA request and the SEC said we're not going to give the records under our exemption, which is potentially ongoing investigation. So, to suggest that there was an investigation as a result of that, I think, is a leap to begin with. Right? And then we're three years post that. No, but they didn't disclose the information because there was ongoing law enforcement proceeding. Isn't that the FOIA standard? Well, that is the point that FOIA exemption speaks to. Right. And they didn't disclose it. So that's, if anything, that cuts against you, I think. Well, Your Honor. The ongoing nature of the investigation. But there has not been, he doesn't plead that there was anything more to it, that anything more had been happening. Well, the only thing is there's no definitive statement anywhere that the SEC investigation, which was a real investigation, it did take place. Your client, one of the individual clients, was very, very worried about it. And that it never ended. I mean, there's nothing definitively saying it ended as of X date. Well, Your Honor, some of the cases, if you read them, they talk about information getting stale over time, which may be going to Judge Calabrese's materiality argument. And my understanding is, in most instances, the SEC doesn't send you a letter saying we're done, we're closed, unless it's closed pursuant to a resolution. So what is the rule that you want us to announce in connection with the obligation of an issuer to disclose the existence of an SEC investigation? Your Honor, I think you need to look no further than the Lionsgate decision from this case, from this court. In that case, the defendant, who said we're not under, we don't have any litigation or administrative matters. In that case, the company had received Wells notices and had also received a formal SEC order of investigation. And in that case, the court said there's no obligation to disclose unadjudicated or uncharged, not wrongdoing. And I think that's clearly a— So you think that Lionsgate is a bright-line rule? I think it's a bright-line rule. That separates investigations, for example, from actual enforcement proceedings? I think it covers both. Oh. Well, certainly— If there was an SEC enforcement proceeding, don't you think most companies would want to disclose that? Yeah, I think probably so. That's a material matter? To maybe be safer rather than sorry, probably so. Well— Even more recently, this court— I'm suggesting not safe and sorry, but an obligation to disclose an enforcement proceeding. I'm sorry, I didn't hear you. He was just, I think, chuckling. Sorry. I think that bright-line rule, Judge, this court in the recent Plumbers and Speakers case that was issued about a week ago, that revolved involving the Deninsky Bank case and the money laundering out of Russia, they made that same determination. I could briefly talk about the Lorenzo case, because you asked some questions about that. The Lorenzo case didn't say that from now on, just that you can make a market manipulation claim based upon a mistake or an issue. But they did say—and it was unique to that case. Sometimes unique facts make unique decisions, and I think that's true in Lorenzo. In Lorenzo, the defendant, one of the defendants, was an employee. He sent out the misstatement that the firm had missed emails to its investor. He did that at the direction of his boss. The question was who was the maker. The court came out and said the boss was the maker because he controlled it. But so what do we do with the employee? Is he home free? And they said no. He is part of a scheme because he made an affirmative act in conjunction with that, the impact. Now, there is no allegation in this case of Mr. Siciano or certainly Mr. Crawford. Mr. Crawford is a stand-up. The only allegation they have about him is that he worked in the same office and was so close that he must have— So let's focus on Mr. Siciano. All right. So who's Mr. Siciano? There's no allegation that he had any contact with any of the author, that he had any knowledge of it. There's no—all that they allege of Mr. Cornyn, he knew that there would be falsing in regard to the author trying to disclose him. All that they allege is that he was conscientious in what he put out for the company, and that from that, the promotional author parodied or copied that, but they didn't fulfill their responsibility under the law to disclose him. And they're saying because of that, because that happened, and he somehow was in charge of it because he had a perfectly appropriate intent and motive, which was to hire a paid promotion in order to raise the visibility of the company. And that's perfectly appropriate. And I would suggest to the court that if you want to— Would you agree, and this is a hypothetical, but would you agree if the complaint had alleged that he knew that these promoters were using fictitious names and nevertheless compensated them for issuing promotional materials, that that would be a form of a—if not a misstatement, a form of or a component of a manipulative scheme? It could be, Your Honor. And I would suggest that what you do is you look at the cases that they have cited. Clearly, it's ironic that I'm up here saying look at their cases, but I say look at their cases because of the distinction between the facts that are alleged there versus here. If you look at the Radcliffe case and the Galini case, both cases out of the circuit by district court, there you have the CEO fundamentally and intricately involved in the activity. He was writing these articles that were published. They were talking about airing their copy. He was writing them. So I'm—what I should ask of the rebuttal is whether opposing counsel is prepared, if we were allowed an amendment, to allege that Siciliano knew what was being done, that it was fictitious, and was in control in that sense. I think you should ask that plus a little bit more, Judge Calabresi. I think you need to ask what are the facts that you're going to allege rather than the conclusion, and what are the facts that you would allege that show this activity? I'm not asking them to write out the amendment. I'm sorry. I'm asking them whether they are willing to allege that certain facts are there. All right. But I think he has to allege the facts, and that's where I go back to Judge's error. If you look at the Gleickman case, which is the only circuit court case that really travels in this area, and it's from the 11th Circuit, it's very, very close. In fact, they say in that instance the company was, in fact, paying the promoters for it directly, paying an offer for it, but they didn't know that the offer wasn't going to disclose it. Okay? And they said there's no scheme. There's nothing there. They have no duty. If you look at the Cortina case, which is a southern district from this circuit, similar case, similar fact, similar holdings. Can we go to the SEC filing question? One point. You argue Lionsgate, but in Lionsgate the court said you have no duty to disclose an SEC investigation in the facts of that case without more. But here there are disclosures being made with regard to the financial difficulties, the very subject of the SEC's investigation, and presumably that is part of what investors would consider important in any situation. If there are financial difficulties, they go to the earnings, et cetera. And so an investor will assess risk based on that, the risk of investing. And isn't it important to know and isn't it also a duty to disclose that there's an investigation by the SEC that could affect the risk of investing in a company when it directly pertains to financial information, which has already been the subject of disclosure? I would say no to that, Your Honor, because I think the disclosure isn't speaking to investigations. It's speaking to the- No, it's not speaking to investigations. It's speaking to the likelihood of financial difficulties. And whether or not what the company is doing is making light of its difficulties. We're minimizing. I would- the Steemfitters case, the recent case that came out, that had discussions about the fact that there were maybe- it was greatly- the financials were greatly understated because of the magnitude of the money laundering scheme in Estonia. And the court said the fact that there was a designation going on that they later pled, not only was it an investigation, but it was a valid investigation, something came of it, that they said that that still didn't need to be disclosed. And certainly we have a situation here where they told what this is all about, and it's not a big matter to begin with, just as a matter of segregation of duty, that was fully remedied. They don't have any suggestion- they don't even believe that there was any wrongdoing. So what you're really- I think your argument, again, goes back to materiality. That is that the segregation of duties issue that was the subject of the SEC's investigation was not material to the financial condition of the company. But I think that what Judge Walker is pointing out is that once you make statements, and this is, I think, part of the theory of the plaintiff's case, once you start to make statements about financial condition and also the absence of proceedings, then it may be a half-truth. Well, I acknowledge that as you say more, you may have a duty to say even more. The case law says that. But we have to remember the timing of this, too. 2015-2016 is when this event happened, when they disclosed in the SEC filing the accounting issue and the remediation of that. The issue about the statement that the company issued in a press release in 2019, three years later- No, that's the false statement. That's a separate question. What I'm looking at is a duty to disclose before the false statement, not in 2019, but while the investigation was ongoing during the same period that statements were being made about the financial condition, about the accounting treatments and problems that were going on in the company. Your company knew that the SEC investigation was underway all through the class period. Your Honor, the only allegation is that Mr. Rockford went to visit the SEC. There's nothing beyond that. That happened in 2016. And it continued after. There's no indication that it closed it. There's no indication that it closed or that it continued, Your Honor. And so there has to be some plausible inference. It didn't matter. It ultimately doesn't matter. But the question is, is that enough at the pleading stage? It may be that a little bit later on, it's clear enough from all the facts that this is sufficiently distant, sufficiently trivial as not to be material, that you could get summary judgment on that. It may also be that there's not enough at the pleading stage. What we're asking, I think Judge Walker is asking, is whether at the pleading stage they've done enough to get by 2016. And I would say no, Judge. I would say that the fact that they identify an accounting issue that exists that is not under the Lionsgate and the more recent Steamletters case suggests that to the extent that the SEC is looking at it, it doesn't answer. They don't have to report it. As they go on, that's what those cases suggest. Even if they say that we have an accounting issue that we're dealing with, it certainly is not something that they have to do more. Let me close, if I can, Judge, by just saying, if you look at the Glecton case and if you look at the Cortina case and then compare them to the cases, the district court cases from California and Oregon, where the CEOs were very, very much more. The allegations are black and white. They are very starkly different. Here, what you read is we've got Mr. Sissiano. He pays for promotional articles. Has a company do that. He's very careful about what he puts in it. Somebody then often take from them, technically there's nothing about these articles themselves. Of course, by citing to Glecton, you are noting that we don't have a second circuit. We don't have a second circuit precedent on precisely this point. Is that correct? You don't have the Glecton equivalent. Okay. Well, we've kept you well past your time as well, and we'll hear from Mr. I appreciate your giving. Well, thank you. Thank you for coming. Sorry about the rain in New York. Mr. Lieberman. Okay. Thank you. Just to, first of all, when it comes to the SEC point that we were honing in on, we do allege CW2 said at the time that she had left the company in February 2019. The investigation had not yet closed. And that's clearly, that's clearly apparent. Would you just address the more recent steam fitters case? You know, it didn't deal with the scenario where you had a investigation where there was a material weakness being discussed. So the very issue. So the material weakness here was the segregation of duties. Which by the way, say you're using something where if you have proper segregation of duties, you may not engage in something like hiring stockholders to inflate share rights. That's not the type of thing you did. You had a good, strong board or a big strong organization with our checks and balances. Is there an allegation? I'm very focused. I think we all are on the pleadings. Is there an allegation that connects this issue? That was the subject of the SEC's investigation, namely the segregation of duties to the financial condition of the company? Nothing. Nothing specific. Okay. Okay. So now we come. As to this and as to the other, to what you wouldn't might be prepared to allege. If we gave you a chance to amend, are you prepared to make that statement with respect to the SEC? That the presider just asked, which you said not yet, but the et cetera. And with respect, you see, Control knowledge, et cetera. Over the statements that were done. Are you prepared to say that he had that kind of direct control? So you're saying basically you still want us to make it an inference. Give us an opportunity to amend. What would you say in that amendment that makes it more than what you have done now? We would show that you're dealing with the issue of segregation of duties and a corporate structure with expertise. If you have proper segregation of duties, your CEO will be hiring a stock promotion scheme. There will be proper oversight. There will be checks and balances. It's that scenario where it would be impossible for him to do so, You're still, you're still saying that you should infer it from the position of the CEO. You're not saying that you will bring in facts. We chose that. He reviewed controlled. Offered these things. You mean, you mean, what do you mean? You mean as a matter of style? No. First of all, potentially personal, potentially second of all, to show how segregation of duties doesn't relate to the ultimate stock promotion scheme. That's, that's just a matter of style. It's a matter of how corporations are supposed to be working and operating with proper segregation of duties, get expertise, and show how that wouldn't occur if the stock promotion scheme would not occur if you have proper segregation of duties. And then generally based on the facts that have been alleged to either to do further investigation, or when we alleged to show that the CWs and otherwise to show more control by the CEO, how he was aware of the actual precise content of the article, as opposed to the inference that we're making today. But with all that said, certainly we could benefit from them. I would say when it comes to the scheme line, the 10 A and C, we don't see where there's really been any lacking in the meetings yet. We have alleged specifically that the CEO of a company secretly started a stock promotion scheme, and that he did that with an express intent of raising the share. Yeah, well, we had that from your previous argument. Okay. So I would say that we don't see any need for amendments there. And then there's the issue where there's clearly no need for amendments when it comes to the statements regarding the denials. At the end of the class period, the actual statements, the company straight up denies the stock promotion scheme, denies the relationship to IRTH, completely factually false. And when it denies the investigation, completely factually false. There's no need for amendments there. It's a false statement, and they would stand up and have all the... Just to follow up on that, those disclosures were in 2019, correct? Yes. Yeah. So what exactly happened in the market at that time that depended upon those statements? Well, in October of 2018, the company denies both the investigation and the... October of 2018? October of 2018, the first denial was clearly keep the price, share the price stock up. And then at the end of the class period, in April of 2019. So clearly there, the denials increased the share price. As far as the impact of the denials in April, that's where we have to do further investigation on law exclusation. We can certainly... Well, you're saying, with respect to law exclusation in CNR, that there is enough there so that if we were to decide for you on the other grounds, the district court should at least consider that. That it isn't something that we can decide against you without more because we're receiving enough there. That's all you need to say. Clearly with the October statement, it says, no, there's no issue with respect to law exclusion. Clearly kept the share price inflated until the end of the class period. That's an issue for the district court, isn't it? Well, I guess it should be. Well, I guess it should be. The district court did not express denial. The district court did not address at all 19 reasons for volatilities and why there's stock volatility and why those are all succeeding because the main issue regarding stock volatility, the main issue impacting the share price of the company, was this promotion scheme. If the CEO had disclosed the compensation to these promoters, would that have disabled your ability to bring this, at least that aspect of the claim? That would have done a lot to disable it because if it was disclosed, then it would no longer be somewhat of a scheme. It would be disclosed. Well, when you say a lot, wouldn't that have completely disabled your claim? Your Honor, I can't assume here. It had to be disclosed from the outset. We engaged stock promoters in order to inflate our share price for offerings that we intend to do to yield more value. I'm asking these questions just so that I very precisely understand what you're saying. What we really are is, was there enough in the pleadings to demonstrate that there was a duty to disclose by the CEO the compensation to these promoters? The answer is yes, there is enough in the pleadings. Clearly, the reasons, the 19 reasons for volatility, triggers that duty to disclose. Then irrespective of the duty to disclose, because 10A and 10C is not a disclosure deed. It's a disclosure of a scheme in art versus a fraud. But you just told me that if the compensation had been disclosed, that would have disabled your entire case. Yes. Okay, so that affects 10A and 10C as well as 10B. No, because the duty is disclosed because it would no longer be a scheme to inflate the share price. I understand. That would have been disclosed to investors that wouldn't have been seen. Thank you very much. The case is submitted. We'll reserve decision. And we'll turn next to 112 Holdings v. Sentinel Insurance Company, 2180. And I understand that counsel for the appellant is available by phone. Yes. Good morning, Your Honor. I'm sorry. John Goloszewski on behalf of the appellant. Hold on a second, Mr. Goloszewski. What? Thank you very much. All right. Counsel for the appellee is here. So, Mr. Goloszewski, why don't you proceed? And you've reserved no time for rebuttal. I'd like to make the request, Your Honor, if I may.